Filed 5/15/26  P. v. Rodriguez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B341918 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA087944) |
| v. | |
| JOSE BENJAMIN RODRIGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri Merritt, Judge.  Affirmed.

Levine, Flier & Flier and Andrew Flier for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————————

A jury found Jose Benjamin Rodriguez guilty of the murder of Eloise Elizarraraz, his former girlfriend and the mother of his child.[1] The jury also found true a lying-in-wait special-circumstance allegation and that he personally used a firearm in the commission of the murder.

Rodriguez asserts the trial court erred in admitting evidence of his uncharged domestic violence and committed other evidentiary errors. He further contends the trial court erred in failing to instruct the jury on voluntary manslaughter under a heat of passion theory, and that there was insufficient evidence to support the murder conviction and the lying-in-wait special-circumstance finding. We reject these arguments. Rodriguez also asks us to review the sealed transcript of an in camera *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) hearing. We have done so and find no error. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**
*Murder of Elizarraraz*

Rodriguez and Elizarraraz were in an on-and-off again relationship for 12 years. They had a child together, Benjamin. Several months before Elizarraraz's death on January 7, 2017, they separated.

Elizarraraz began communicating with a man in prison. On December 26, 2016, she posted a photo of herself and this

—————————————————

[1] Some of the relevant family members who testified at trial share the same last names. We use first names for clarity and to be consistent with the record on appeal and the parties' briefs, which refer to the family members only by first name and last initial.

man on Facebook with hearts around it and the words: "With love . . . Only for you."

On January 6, 2017, Elizarraraz, Benjamin, and Elizarraraz's two other children spent the night at the home of Elizarraraz's sister, Monique. Elizarraraz's mother, Connie, was also there. That evening, Benjamin overheard Elizarraraz on the phone with Rodriguez. He could not hear what his father was saying, but he heard his voice. He knew it "wasn't a good phone call" because his mother had been "enjoying herself" and then started yelling.

Around 9:00 p.m., Rodriguez texted Elizarraraz. They argued by text message until approximately 10:15 p.m., when Elizarraraz stopped responding.

Around 1:00 a.m., Elizarraraz's brother, Robert, received a voicemail from Rodriguez stating, "Hey, What's up Bob? Just wanted to see how you are doing. Hope everything is good." Although Robert and Rodriguez worked together and Robert had received calls from Rodriguez, Robert found this voicemail unusual. Rodriguez's call came from his usual telephone number.

On January 7, around 7:00 or 8:00 a.m., Connie, Benjamin, and Monique all saw Elizarraraz leave Monique's house for work. Shortly afterwards, Monique heard gunshots.

Around 8:45 or 9:00 a.m., Brittney I. was returning home when she saw a black car on the sidewalk.[2] The driver's side window was shattered, and a woman, later identified as Elizarraraz, was in the driver's seat, slumped over. Elizarraraz was bleeding from her neck. Brittney checked for a pulse but did

---

[2] At trial, the parties and the trial court agreed to refer to Brittney I. by her first name and last initial only because she was nervous about testifying.

3

not find one.  Elizarraraz's body was blue and warm.  Brittney asked bystanders to call 911 and started CPR, but she was unable to revive Elizarraraz.

On January 13, 2017, a warrant was issued for Rodriguez's arrest.  In May 2017, he was arrested in Mexico.

## *Charges and Trial*

In 2018, the People charged Rodriguez with Elizarraraz's murder.  (Pen. Code, § 187, subd. (a).)[3]  The information alleged that Rodriguez used and discharged a handgun during the commission of the crime, within the meaning of section 12022.53, subdivisions (b), (c), and (d).  It further alleged a lying-in-wait special circumstance.  (§ 190.2, subd. (a)(15).)

At trial, the prosecution called 10 witnesses.[4]  A deputy medical examiner testified that Elizarraraz died from a gunshot wound to her neck.  A Los Angeles Police Department (LAPD) homicide detective testified that he arrived at the crime scene around 10:45 a.m. on January 7.  A black car had crashed on the sidewalk.  There was a bullet hole in the driver's side window. The detective identified items found in the car, including a phone. The phone belonged to Elizarraraz.

### 1.    Texts and other phone evidence

Detectives obtained a search warrant for Elizarraraz's phone and a report of her text messages from the night of January 6, 2017.  At trial, the court admitted into evidence a text exchange between Elizarraraz and the number Robert testified Rodriguez used.

---

[3]    All undesignated statutory references are to the Penal Code.

[4]    Rodriguez did not testify or put on any evidence.

4

Rodriguez wrote first: "I need to get at u ASAP." Elizarraraz responded, "What," and Rodriguez wrote: "U know." After a similar exchange, Rodriguez wrote: "Why wouldn't u tell me u r with a bitch n***a in jail," and "answer that n***a."[5] Elizarraraz responded that she did not "need to answer shit."

In a series of messages that followed, Rodriguez accused Elizarraraz of being with another man to hurt him and of not caring for him; of not telling him she was with another man; and of not answering his calls. He suggested people knew about the other man, claiming: "I'm be[ing] real this time the homies I'm with they r worry but I said its ok[.]" When Elizarraraz would not agree to talk with Rodriguez on the phone, he threatened her and made disparaging comments, such as "U will see," "Answer bitch," "Watch it won't stay like this at all u will see how," "Watch . . . u did me dirty hoe," "Dirty ass bitch now I really hate u," and, "Don't ever let me catch u around."

Elizarraraz responded that she did not intentionally hurt him; that she did not need to tell him her "business," and she had thought they would never talk again; she did not have to answer to anyone and did not want to talk to him by phone; and, ultimately, "Fuck u lame ass bitch.. I dont give a fuck."

Susan Johnson, T-Mobile's custodian of records, responded to three search warrants for additional phone records. At trial, she identified the numbers: one subscribed to Sonia Rodriguez and Stephanie Sanchez, one subscribed to Santos Hernandez,

---

[5] We quote the messages as they appeared in the original, including spelling and capitalization, except for the repeated slur which we have partially redacted. (See *People v. Aguirre* (2025) 18 Cal.5th 629, 654, fn. 11.)

and one for a prepaid number. Sonia is Rodriguez's sister and Santos Hernandez is his cousin.

An FBI special agent analyzed the phone records from January 7, 2017. He testified that cell phone tower data showed the prepaid number associated with Rodriguez was in an area that included Monique's residence and the crime scene from 8:21 to 8:50 a.m. The number went "off network" late in the morning. However, it first made outgoing calls to the phones subscribed to Hernandez, and to Sonia and Sanchez, which cell phone tower data placed near Chatsworth and Balboa in the San Fernando Valley at the time of the calls. Cell tower data placed the phones near the Mexican border at 3:26 p.m.

## 2. Surveillance videos

The People played recordings from surveillance cameras located at a house across the street from Monique's home on the morning of January 7, 2017, showing the street in front of the house. At 6:13 a.m., while it was still dark, a car parked on the street and turned its lights off. At 7:15 a.m., in the daylight, a white car was parked in the same spot.

Monique identified Elizarraraz in one of the recordings. The video showed that Elizarraraz left Monique's house and got into a black car at 8:22 a.m. She pulled out and turned her car around. At 8:23 a.m., a white vehicle drove just past Monique's house and pulled alongside Elizarraraz's vehicle. The cars drove parallel to each other before they exited the camera's frame.

Monique testified that it would take less than a minute to drive from where Elizarraraz's car was parked to where it was later found crashed on the sidewalk.

Benjamin testified that the recording showed his mother's black car parked in front of Monique's house. He identified his

mother in the video and testified it accurately reflected what she was wearing the morning of January 7 when she left for work. He further identified the white Jeep that came into the frame and pulled up next to his mother's car as his father's, testifying he was "100 percent sure" it was Rodriguez's car.

A neighbor testified that the videos came from surveillance cameras at her house. The time and date stamps in the footage were accurate. She provided the recordings to detectives on January 7.

### *Conviction and Sentencing*

The jury found Rodriguez guilty of murder (§ 187, subd. (a)) and found true allegations that he personally used a handgun (§ 12022.5, subd. (a))[6] and committed the murder intentionally by means of lying in wait (§ 190.2, subd. (a)(15)). The trial court denied a defense motion for a new trial. It sentenced Rodriguez to life without the possibility of parole.

Rodriguez timely appealed.

## DISCUSSION

## I. The Trial Court Did Not Abuse Its Discretion By Admitting Evidence of Uncharged Past Acts

Rodriguez contends the trial court erred in admitting evidence of his prior uncharged acts. He argues the alleged acts were uncorroborated, many were remote in time, they were more prejudicial than probative, and the trial was "overwhelmed" and "hijacked" by the prior acts evidence. We find no abuse of discretion.

---

[6] During trial, the People moved to strike the section 12022.53 allegations and to amend the information to add a new section 12022.5, subdivision (a), allegation. The defense did not object.

### A.    Background

Before trial, Rodriguez moved to exclude the prosecution's proposed past acts evidence on the ground that it violated Evidence Code section 352.  The trial court found most of the evidence admissible under Evidence Code sections 1109 and 352.  At trial, four witnesses who testified about events on January 6 and 7, 2017, also testified about uncharged domestic violence involving Rodriguez and Elizarraraz.

#### i.    Connie

Connie testified that Rodriguez and Elizarraraz were in a relationship for about 12 years.  Connie estimated that Rodriguez and Elizarraraz separated between four and five months, or "maybe longer," before Elizarraraz's death.

Approximately five years before Elizarraraz's death, Rodriguez described his jealousy to Connie and told her he wanted to kill Elizarraraz because of how much he loved her.  At one point, Elizarraraz told Connie that Rodriguez followed her everywhere.

Rodriguez and Elizarraraz would argue.  In the two years before Elizarraraz's murder, their arguments became more frequent.  Elizarraraz would call Connie to pick her up in the middle of the night.  On multiple occasions, Connie saw injuries on Elizarraraz, including once when Rodriguez bit her on the lip and nose.  Several times, Connie personally witnessed Rodriguez's physical abuse of Elizarraraz.  Close to the time of Elizarraraz's murder, Connie saw Rodriguez hit Elizarraraz.

On Halloween in 2016, after Rodriguez and Elizarraraz had broken up, Rodriguez followed Connie, Elizarraraz, and Elizarraraz's children while they went trick-or-treating.

### ii. Benjamin

Benjamin described his parents' relationship as "very abusive" and testified they "had a lot of fist fights." During arguments, Rodriguez "would also take it to a physical level with [Elizarraraz] and she was just responding physical back." Rodriguez slapped, choked, bit, and punched Elizarraraz once or twice a week.

About a year or a year and a half before Elizarraraz's death, Benjamin witnessed a particularly bad argument. Elizarraraz was trying to get Rodriguez to leave her apartment and told the children to call the police. Rodriguez took the phone out of Elizarraraz's daughter's hand, which he "squeezed," hurting and bruising her. Rodriguez was "coming towards" Benjamin and his sister and "pushing" Elizarraraz off, and they slapped each other. Elizarraraz threw a golf club at Rodriguez, and Rodriguez choked Elizarraraz against a wall. The altercation lasted 35 to 40 minutes.

On January 2, 2017, Benjamin witnessed his father "pleading" with his mother to let him inside her apartment. He tried to force his way inside for 10 to 15 minutes, a video of which was played for the jury. The video also showed Rodriguez pulling into a parking spot at Elizarraraz's apartment in a white Jeep.

### iii. Robert

Robert testified that he and Rodriguez were "close" and had a "good relationship." Robert worked with Rodriguez. Rodriguez told Robert that he was jealous when it came to Elizarraraz and he "wouldn't be able to be without [Elizarraraz]." Rodriguez also told Robert he would not be able to "allow" Elizarraraz to be with someone else.

Elizarraraz and Rodriguez had a "complicated" relationship. On more than five occasions, Rodriguez called Robert and threatened to "do something" to Elizarraraz if she did something Rodriguez did not like, including spending time with people other than Rodriguez. The most recent call was when the couple last separated, three to six months before Elizarraraz's murder.

Robert once saw bite marks on Elizarraraz's face and bruises on her body, but he never witnessed any physical abuse.

### iv.    Monique

Monique testified that throughout Elizarraraz's and Rodriguez's relationship, she observed Elizarraraz with bruises and cuts. At some point during the last four months before Elizarraraz's death, when Elizarraraz and Rodriguez were still seeing each other "on and off," Elizarraraz arrived at Monique's house with a bruised lip and an injured finger. Rodriguez once told Monique he could not be without Elizarraraz. Elizarraraz told Monique that Rodriguez needed her by his side all the time.

### v.    Jury instruction

The trial court instructed the jury with CALCRIM No. 852A, "Evidence of Uncharged Domestic Violence," which, in relevant part, stated: "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. . . . [¶] If the People have not met this burden of proof, you must disregard the evidence entirely. [¶] If you decide the defendant committed the uncharged domestic violence, you may but are not required to conclude from that evidence the defendant was disposed or inclined to commit domestic violence, and based on that decision also conclude [that] the defendant was likely to

10

[commit] and did commit the murder of [Elizarraraz], as charged here. If you conclude the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of the murder of [Elizarraraz]. The people must still prove the charge and each allegation beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose."

## B.     Evidence Code section 1109

Evidence of prior acts is inadmissible to prove a defendant's conduct on a specified occasion. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; Evid. Code, § 1101, subd. (a).) However, when a defendant is charged with an offense involving domestic violence, evidence of the defendant's commission of prior domestic violence is admissible to prove the defendant's propensity to commit the charged crime, if it is not inadmissible under Evidence Code section 352. (Evid. Code, § 1109, subd. (a)(1); *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192.) Evidence Code section 1109 "reflects the Legislature's determination that in domestic violence cases, similar prior offenses are uniquely probative of a defendant's guilt on a later occasion." (*Merchant*, at p. 1192.) Evidence of a prior act of domestic violence must be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review the trial court's admission of evidence of prior acts of domestic violence for an abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

11

## C. The evidence was more probative than prejudicial

The trial court did not abuse its discretion in admitting the prior acts evidence under Evidence Code sections 1109 and 352.

The trial court reasonably concluded the evidence was highly probative. It was relevant to the People's theory that Rodriguez intentionally killed Elizarraraz out of jealousy. (*People v. Cage* (2015) 62 Cal.4th 256, 275 (*Cage*) [prior acts "supported the evidence of defendant's identity as the killer" and were "important indirect evidence of defendant's intent" and thus premeditation].) Indeed, Rodriguez's past acts showed a pattern of violence and threats of violence against Elizarraraz. This "fairly unbroken pattern of domestic abuse," showed a "propensity to commit the act[]" on Elizarraraz. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 706 (*Cabrera*).) The prior acts of physical abuse, threats, and attempts to control Elizarraraz were additionally relevant to establish identity, intent, and motive. (*People v. Zack* (1986) 184 Cal.App.3d 409, 415 [defendant's prior assaults on victim were admissible as to identity, intent, and motive].)

The past acts were not remote. (*Cabrera*, *supra*, 152 Cal.App.4th at p. 706 [with a "pattern" of abuse, "that the first of the five incidents was almost 10 years old did not render it unduly remote"].) The violence and threats were ongoing throughout Rodriguez's and Elizarraraz's relationship, including in the months and days before Elizarraraz's death.

The evidence of uncharged past acts did not create a substantial danger of undue prejudice. There is no evidence of any grave injury during the prior incidents or use of a firearm. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [prior act

12

"not inflammatory compared to the charged offense" because unlike charged offense, defendant never previously fired a gun or attempted to kill].)  Thus, the trial court properly concluded that the prior acts were less inflammatory than the murder charge, "reducing the possibility the jury's passions would be inflamed by the uncharged conduct." (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1078.)

The evidence of past acts also did not consume an undue amount of time.  The evidence came from four individuals who also testified about the events the night before and the morning of the murder.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 371 [no undue consumption of time when testimony of prior acts "supplied almost exclusively by defendant's mother and brother, who also testified as to the charged offenses"]; *People v. Caparaz* (2022) 80 Cal.App.5th 669, 685 [abuse of discretion to exclude testimony where witness was already testifying about other topics and could have testified to excluded evidence during allotted time].)  The evidence also did not overwhelm the trial; four of the ten witnesses testified about Rodriguez's prior conduct.  (Cf. *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1162 [high probability of undue consumption of time when 13 witnesses testified, at least in part, to prior acts evidence, over 8 days of 12-day trial].)  Any cumulative testimony was minimal and served to corroborate the accounts of other witnesses.

Finally, there is no indication of a significant possibility of confusion.  The evidence established that Rodriguez engaged in a pattern of abuse against Elizarraraz.  The past acts did not involve violence against other victims, which might confuse a jury.  The record also fails to support Rodriguez's argument that the evidence of past acts overwhelmed the evidence of the

13

murder. The past acts were factually distinct from the drive-by shooting that killed Elizarraraz. Confusion was therefore unlikely. Further, the jury was instructed pursuant to CALCRIM No. 852A. We presume the jury followed this instruction. (*People v. Reyes* (2016) 246 Cal.App.4th 62, 78.)

## II. Other Evidentiary Issues

### A. Standard of review

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) Under this standard, " 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

### B. Bench warrant

Rodriguez contends the trial court erred in excluding evidence that, at the time of the murder, there was an outstanding bench warrant for his arrest in a different case. We find no abuse of discretion.

Rodriguez asked the court to take judicial notice of a court docket reflecting the issuance of a December 23, 2016 bench warrant in the amount of $80,000 for his arrest in a different matter. He asserted the warrant would provide an alternative explanation for why he was in Mexico three weeks after Elizarraraz's murder. The People objected, arguing the theory would require the jury to speculate that Rodriguez knew of the bench warrant. The trial court agreed and declined to admit it.

14

Defense counsel then stated that his understanding from Rodriguez's prior counsel was that Rodriguez was in court and discovered the warrant, and he left upon learning that the bail amount would be increased from $10,000 to $80,000. The trial court replied this was hearsay and also noted there was evidence that Rodriguez remained in the country for some time after the bench warrant was issued. The court cited the video footage that showed Rodriguez trying to enter Elizarraraz's home on January 2, 2017.

On appeal, Rodriguez argues the trial court erred because the bench warrant was subject to judicial notice. He also asserts that the warrant was highly relevant, not speculative, and not hearsay. However, he does not address the reason for the trial court's ruling: the lack of evidence that he had any knowledge of the bench warrant.

Without admissible evidence that Rodriguez was even aware of the bench warrant, there was no evidence from which the jury could reasonably infer that he fled to Mexico because of it. (See Evid. Code, §§ 401, 403 [when the relevance of evidence is dependent on the existence of a preliminary fact, the evidence is inadmissible unless the court finds there is evidence sufficient to sustain a finding of the existence of the preliminary fact].) Rodriguez has offered no argument or legal authority to establish any trial court error based on its finding of a lack of "nexus" or relevance. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694 [burden on appellant affirmatively to show trial court error, and trial court order presumed correct].) We find no abuse of discretion.

### C.    Phone records

The trial court admitted phone records for the cell phones associated with Rodriguez, his cousin, and his sister.  Rodriguez argues that the People failed to establish all elements of Evidence Code section 1271, the business records exception to the hearsay rule.  We again find no error.

A hearsay writing is admissible if it was "made in the regular course of a business"; "at or near the time of the act, condition, or event"; a custodian "testifies to its identity and the mode of its preparation"; and, in relevant part here, "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1271, subds. (a)–(d).)

T-Mobile representative Johnson testified that she was a manager with T-Mobile's law enforcement relations group and the custodian of records.  She responded to the search warrants for Rodriguez, his sister, and his cousin.  Johnson was familiar with the mode of preparation for the records, and she testified they were prepared electronically, for purposes of billing, in the regular course of business, at or near the time of the act, condition, or event.  She explained that the records consisted of "subscriber information" and "call detail records" showing incoming and outgoing calls and messages, and "cell file information" showing the location of the cell towers.

Rodriguez objected based on hearsay and foundation under Evidence Code section 1271.  He argued there was a lack of foundation because one of the numbers had two listed subscribers: Sonia and Sanchez.  The trial court overruled the objections.

For the first time on appeal, Rodriguez asserts that the requirements of Evidence Code section 1271, subdivision (d), were not met.  He relies on *People v. Zavala* (2013) 216 Cal.App.4th 242, 248, in which the court held that "a printed compilation of call data produced by human query for use at trial falls under the business records exception where the underlying data is automatically recorded and stored by a reliable computer program in the regular course of business."  Rodriguez argues the People failed to present evidence showing how the cell phone data was recorded or stored and, therefore, there was insufficient evidence of the records' trustworthiness.

We agree with the People that this claim is forfeited. Rodriguez's objection in the trial court concerned only the two subscribers affiliated with the telephone number.  His failure to contend below that the evidence was inadmissible under Evidence Code section 1271, subdivision (d), precludes him from raising the issue for the first time on appeal.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 689; see also *People v. Williams* (2008) 43 Cal.4th 584, 620 [objection necessary in criminal trial because contrary rule would deprive People of opportunity to cure defect at trial].)

### D.    Text messages

Rodriguez next contends the trial court abused its discretion by admitting the text message exchange from the night of January 6, 2017.  We disagree.  The court overruled Rodriguez's hearsay objection because of the uncontroverted evidence that the text exchange was between Elizarraraz and Rodriguez.  Robert testified that Rodriguez had called him from the same number, including only a few hours after the text exchange.

17

The texts from Rodriguez were admissible as party admissions.  (Evid. Code, § 1220; *People v. Gonzalez* (2021) 12 Cal.5th 367, 409; *People v. Flinner* (2020) 10 Cal.5th 686, 735 [party admission is an exception to hearsay].)  Rodriguez does not contest that he sent the texts to Elizarraraz or present any argument that the party admission exception does not apply.  To the extent Rodriguez is also raising an issue with the texts from Elizarraraz, they were not offered for their truth and therefore were not hearsay.  (Evid. Code, § 1200.)

Regarding foundation, defense counsel objected because the text message report showed "6-1-2017."  He asserted this suggested the messages were sent in *June* 2017.  However, a homicide detective testified that the month and the day are often transposed in cell phone records.  Further, Elizarraraz died before June 2017, and the texts were found on her phone.  The trial court properly overruled defense counsel's objection based on the transposed numbers.

Finally, Rodriguez argues the text messages were improperly authenticated.  Rodriguez forfeited this argument by failing to object on this ground in the trial court.  (*People v. Derello* (1989) 211 Cal.App.3d 414, 428, citing *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640.)  Moreover, Rodriguez provides no specific claim of error, aside from asserting that "[o]ther than the implication that these were written by appellant to [Elizarraraz] the proof was insufficient to allow admittance and therefore the texts should have been excluded."  The trial court could reasonably credit Robert's uncontroverted testimony that the number was Rodriguez's.  The phone records also showed that this number called Rodriguez's sister and cousin the morning of the murder, further tying the messages to Rodriguez.

### E.     Video

Rodriguez additionally contends the trial court erred in admitting the video of Elizarraraz getting into her car and a white vehicle pulling up next to it.  He asserts the video was inadmissible due to insufficient foundation and authentication as to its time and date stamp.  We again find no error.

"Authentication of a writing is required before it may be received in evidence."  (Evid. Code, § 1401, subd. (a).)  Proper foundation requires "sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered."  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.)

Rodriguez again asserts that because the dates on the video were transposed, the video may have been from "July, not January."  The evidence is to the contrary.  Monique's neighbor testified that when law enforcement requested video from the morning of January 7, she was able to verify the date and time based on the time stamps on the video.  She also testified that her cameras were working properly.  Critically, she provided the video to the detectives on January 7, and she testified that her cameras only save video for 15 days.  Thus, the video could not be from July 2017.  The trial court did not err in admitting the video.

### III.   There Was Sufficient Evidence for the Jury's Lying-in-Wait Special-Circumstance Finding and Murder Conviction

Rodriguez contends there was insufficient evidence to support the lying-in-wait special-circumstance finding and the murder conviction.  We disagree.

19

## A. Standard of review

" 'The test for evaluating a sufficiency of evidence claim is deferential.' [Citation.]" (*People v. Pierce* (2025) 114 Cal.App.5th 508, 522.) "[W]e review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) We must " ' " "presume in support of the judgment the existence of every fact the [jury] could reasonably deduce from the evidence," ' " and we accept logical inferences the jury might have drawn from circumstantial evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) We do not reverse unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

## B. Lying-in-wait

The jury found Rodriguez "intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) The jury was instructed with CALCRIM No. 728, which required the jury to find: (1) Rodriguez "concealed [his] purpose from the person killed"; (2) he "waited and watched for an opportunity to act"; (3) he "made a surprise attack on the person killed from a position of advantage"; and (4) he "intended to kill the person by taking the person by surprise." The instruction further explained that the "lying in wait" also needed to be of a duration that is "substantial and must show a state of mind equivalent to deliberation or premeditation," and "[t]he concealment can be accomplished by ambush or some other secret plan."

There was sufficient evidence for the jury to find the allegation true. Video footage showed a white vehicle parked near Monique's house for approximately two hours. After Elizarraraz entered her car, a white Jeep, identified as Rodriguez's, pulled up next to hers. The jury could reasonably infer that Rodriguez went to Monique's house to wait for Elizarraraz. He knew where Monique lived, having been there before. He concealed himself by parking nearby, but not in front of the house. He then watched and waited for an opportunity to shoot Elizarraraz. He carried out a surprise attack from a position of advantage, shooting her through her driver's side window. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 786 [concealment of purpose, watchful waiting, and a surprise attack established where victims were unaware of shooters hidden in bushes, who jumped out and then fired]; *Cage*, *supra*, 62 Cal.4th at pp. 279–280 [defendant went to victim's door with shotgun hidden in laundry basket and conversed with the victim before shooting her].) The two hours Rodriguez waited and his prior threats further demonstrated his intent to kill.

While Rodriguez argues that his car pulling up at the same time as Elizarraraz was leaving could be "happenstance," the evidence that he waited for two hours belies this contention. The jury could reasonably conclude that Rodriguez waited until Elizarraraz left so that he could shoot her by surprise. (See *People v. Wright* (2015) 242 Cal.App.4th 1461, 1496, 1464, (*Wright*) [defendant knew the victim's work schedule, waited for him to return from work, and "sneaked up on him unaware and shot him while he was in his car"].)

21

Viewing the record in the light most favorable to the verdict, substantial evidence supports the jury's true finding on the lying-in-wait special-circumstance allegation.

### C. Murder conviction

Rodriguez also asserts the evidence was insufficient to convict him of murder. His argument is limited to a single paragraph: "The problem here is that the People did not prove that Appellant <u>caused</u> the death. No one saw Appellant shoot [Elizarraraz]; no weapon was found; and no DNA was present. A car that appeared similar to one allegedly owned by Appellant was partially captured in a video. That is not enough. The 1109 evidence merely sullied Appellant's reputation, but did not prove anything."

We disagree. There was sufficient evidence for the jury to conclude Rodriguez killed Elizarraraz. His son identified Rodriguez's white Jeep in the video. Rodriguez and Elizarraraz argued the night before. Cell phone evidence placed him near the crime scene around the time of the murder and indicated he called his sister and cousin shortly afterwards. The sister's and cousin's phones were in Los Angeles at that time, but later near Mexico. Rodriguez was arrested in Mexico three weeks later, suggesting he fled after the murder, showing consciousness of guilt. Rodriguez had previously been violent with Elizarraraz and had threatened to kill her. He told others that he could not allow Elizarraraz to be in a relationship with someone else and, the night before the murder when the two argued about her relationship with another man, Rodriguez said she had done him "dirty." He warned, "don't ever let me catch [you] around." This was sufficient evidence for the jury to conclude that Rodriguez shot Elizarraraz.

22

## IV. Failure to Instruct on Voluntary Manslaughter

Rodriguez contends the trial court erred by denying his request for a jury instruction on voluntary manslaughter on a heat-of-passion theory. We disagree.

"[A] trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury." (*People v. Choyce* (2025) 18 Cal.5th 86, 104 (*Choyce*).) "Substantial evidence in this context is that which a reasonable jury could find persuasive. [Citation.] In deciding whether there exists sufficient evidence to support a requested instruction, trial courts should resolve all doubts in favor of the accused. [Citation.] However, speculation is not evidence and will not warrant the giving of an instruction on a lesser included offense." (*Ibid.*)

" 'Manslaughter is the unlawful killing of a human being without malice.' (§ 192.) Voluntary manslaughter is that committed 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) Voluntary manslaughter is considered a lesser, necessarily included, offense of intentional murder." (*Choyce, supra*, 18 Cal.5th at p. 104.)

The heat of passion theory of manslaughter has an objective and a subjective component. (*Choyce, supra*, 18 Cal.5th at p. 104.) " 'The defendant must actually, subjectively, kill under the heat of passion.' [Citation.]" (*Ibid.*)[7] Additionally, " ' "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under

---

[7]    Because, like the trial court, we conclude that the objective component is not met, we need not and do not address the subjective component.

the given facts and circumstances." ' [Citation.]" (*Id*. at p. 105.) It must also be based on sufficient provocation "caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim." (*Ibid*.)

The trial court refused the instruction after finding no evidence that Elizarraraz provoked Rodriguez. The court also observed that the time between the texts and the murder would have allowed a person of average disposition to regain judgment and reasoning. Rodriguez asserts this was error. He cites his "long tumultuous relationship" with Elizarraraz, that he recently learned she was involved with someone else, his resulting embarrassment, and the culminating heated text message exchange the night before the murder. He thus argues that despite the absence of provoking conduct immediately before the murder, there was still evidence of provocation warranting a voluntary manslaughter instruction.

"[P]rovocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time." (*People v. Wharton* (1991) 53 Cal.3d 522, 569; accord, *People v. McShane* (2019) 36 Cal.App.5th 245, 256 ["provocation 'may comprise a single incident or numerous incidents over a period of time' "].) Still, " ' "if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." [Citation.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 550 (*Moye*).)

Here, there was insufficient evidence that Rodriguez's killing of Elizarraraz was the result of provocation, given the length of time that passed between their text exchange, which Rodriguez claims was the culminating provocative conduct, and

24

the shooting.  Rodriguez's last text was at 10:16 p.m., and Elizarraraz did not respond.  Elizarraraz was shot at approximately 8:23 a.m. the next morning.  For the provocation to be sufficient, it must "eclipse[] reflection," such that the person "simply reacts from emotion due to the provocation, without deliberation or judgment." (*People v. Beltran* (2013) 56 Cal.4th 935, 950.)  "Accordingly, it is not sufficient that a person 'is provoked and [then] *later* kills.' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 539.)

Rodriguez and Elizarraraz separated months before the murder.  There was no evidence of an ongoing or escalating series of provocative acts.  This case is therefore unlike *People v. Berry* (1976) 18 Cal.3d 509, 512–514, in which the victim engaged in two weeks of sexual taunting of the defendant before he killed her, and *People v. Borchers* (1958) 50 Cal.2d 321, 328–329, which involved a victim who urged the defendant to shoot her and accused the defendant of cowardice immediately before he shot her.  Instead, the evidence here established only that at an unspecified time, Rodriguez learned of Elizarraraz's relationship with someone else and he angrily confronted her by text message.  Over 10 hours later, he killed her in a surprise attack.  This evidence was insufficient for the jury to find Rodriguez's reason " ' "was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' [Citation.]" (*Moye, supra*, 47 Cal.4th at p. 550.)  The trial court properly rejected a voluntary manslaughter instruction.

Moreover, even assuming the trial court erred in failing to instruct the jury on voluntary manslaughter, any error was

harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Choyce, supra*, 18 Cal.5th at p. 106 [applying *Chapman* to the failure to instruct on lesser included offense of voluntary manslaughter], citing *People v. Schuller* (2023) 15 Cal.5th 237, 243.) " 'Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.' [Citation.]" (*People v. Horning* (2004) 34 Cal.4th 871, 906.)

The jury found true the lying-in-wait special circumstance. The instruction stated that the duration of the wait must "show a state of mind equivalent to deliberation or premeditation." The instruction went on: "Deliberation means carefully weighing the considerations for and against a choice and knowing the consequences deciding to act," and "[a]n act is done with premeditation if the decision to commit the act is made before the act is done."

Given these requirements, "our Supreme Court has found that a lying-in-wait special-circumstance finding renders the failure to instruct on provocation/heat of passion manslaughter harmless error." (*Wright, supra*, 242 Cal.App.4th at p. 1498, citing *People v. Cruz* (2008) 44 Cal.4th 636, 665 (*Cruz*).) In *Wright*, the court observed that any error in failing to instruct on heat of passion was harmless because the jury's true finding on the lying-in-wait special circumstance established it "must have believed the evidence showed defendant shot [the victim] with 'a state of mind equivalent to deliberation or premeditation' in order to return a true finding on the lying-in-wait special-circumstance finding." (*Wright*, at p. 1497.) In *Cruz*, the jury

26

also found true a lying-in-wait special circumstance, and our high court reasoned that this and other "special circumstance findings themselves negate any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion . . . theories of manslaughter." (*Cruz*, at p. 665.)

Similarly, here, any failure to instruct on voluntary manslaughter was harmless. Although *Wright* and *Cruz* analyzed prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836, the underlying reasoning of those decisions indicates that, under the circumstances of this case, any error was harmless under *Chapman*'s stricter "beyond a reasonable doubt" standard (*Chapman*, *supra*, 386 U.S. at p. 24). Rodriguez drove to Monique's house and waited for Elizarraraz for approximately two hours. (Cf. *Cruz*, *supra*, 44 Cal. 4th at pp. 648, 680 [defendant was lying in wait for 15 minutes].) The jury necessarily determined this established that Rodriguez committed murder with a state of mind equivalent to deliberation or premeditation when it found true the lying-in-wait allegation. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 416 [" 'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.' [Citation.] Proof of lying in wait ' "distinguish[es] those cases in which a defendant acts insidiously from those in which he acts out of rash impulse." ' "].) There is therefore no possibility that the jury would also have concluded that Rodriguez acted *without* deliberation or judgment sufficient to convict him only of voluntary manslaughter under a heat of passion theory.

Rodriguez has not shown prejudicial error.

## V.    *Pitchess* **Review**

Before trial, Rodriguez filed a motion under *Pitchess*, *supra*, 11 Cal.3d 531, as to Detective James Fillmore, who investigated the case.  Defense counsel filed a declaration stating that a prosecutor had advised him of evidence in Fillmore's personnel file that might potentially be exculpatory or could be used for impeachment.  The LAPD conceded on the motion and produced records.  On September 9, 2022, the trial court reviewed the records in camera and found discoverable information.  The court ordered the police department to produce the information to the defense.

Rodriguez now requests our independent review of the in camera portion of the trial court's *Pitchess* proceeding to determine whether the trial court properly evaluated discoverability or abused its discretion.  (See *People v. Mooc* (2001) 26 Cal.4th 1216.)  The People do not object.  We have reviewed the sealed record and conclude the court fulfilled its obligations under *Pitchess*.[8]

---

[8]    We have not found multiple errors.  We therefore need not address Rodriguez's cumulative error argument.  (*People v. Midell* (2025) 113 Cal.App.5th 1060, 1083 [no cumulative error if no errors to cumulate].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.